# 15-2821-CV

## United States Court of Appeals

*for the*

## Second Circuit

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

SAMUEL E. WYLY,

*Defendant-Appellant,*

DONALD R. MILLER, JR., in his capacity as the Independent Executor of the
Will and Estate of CHARLES J. WYLY, JR., AKA CHARLES J. WYLY, JR.,

*Defendant-Relief Defendant-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR APPELLANTS

MARK H. HATCH-MILLER
SUSMAN GODFREY LLP
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

KATHLEEN M. SULLIVAN
ELLYDE R. THOMPSON
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

DEREK L. SHAFFER
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
777 6th Street, N.W., 11th Floor
Washington, D.C. 20001
(202) 538-8000

*Attorneys for Appellants*

---

LOUIS J. SCHAUFELE, III, MICHAEL C. FRENCH, DAVID MATTHEWS,

*Defendants,*

LISA WYLY, JOHN GRAHAM, KELLY WYLY O'DONOVAN, ANDREW WYLY, CHRISTINA WYLY, CAROLINE D. WYLY, CHARLES J. WYLY, III, EMILY WYLY LINDSEY, JENNIFER WYLY LINCOLN, JAMES W. LINCOLN, CHERYL WYLY, EVAN ACTON WYLY, LAURIE WYLY MATTHEWS, MARTHA WYLY MILLER, EMILY WYLY, CHRISTIANA WYLY,

*Relief Defendants.*

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT ......................................................3

ISSUES PRESENTED..........................................................................3

STATEMENT OF THE CASE .............................................................4

    A.      Statutory And Regulatory Background ...............................4

    B.      Factual Background.............................................................6

    C.      The SEC Complaint...........................................................11

    D.      Procedural History.............................................................13

    E.      The Jury Trial On Liability ................................................14

    F.      The Bench Trials On Remedies .........................................17

          1.      The Tax-Based Disgorgement Order .......................17

          2.      The Trading-Profits Disgorgement Order.................18

    G.      Post-Trial Proceedings ......................................................20

SUMMARY OF ARGUMENT .............................................................21

STANDARD OF REVIEW ...................................................................23

ARGUMENT ........................................................................................24

I.      THE SEC'S CLAIMS FOR DISGORGEMENT ARE TIME-BARRED AS TO ANY CONDUCT BEFORE FEBRUARY 1, 2001 UNDER THE FIVE-YEAR STATUTE OF LIMITATIONS SET FORTH IN 28 U.S.C. § 2462 .......................................................24

    A.      The Disgorgement Awards Are "Forfeitures" Within The Meaning Of 28 U.S.C. § 2462.....................................25

i

1. "Forfeiture" And "Disgorgement" Are Synonymous ...............26

2. A "Forfeiture" May Be Remedial Rather Than Punitive ..........29

3. Exempting "Disgorgement" From Section 2462 Would Undermine The Purpose Of The Statute of Limitations ..........31

B. The Disgorgement Awards Here Amount To A "Penalty" Within The Meaning Of 28 U.S.C. § 2462 .........................32

II. THE DISGORGEMENT ORDERS ARE IMPROPER REMEDIES FOR THE SECURITIES VIOLATIONS HERE ..........................................34

A. The District Court's Tax-Based Disgorgement Award Is An Abuse Of Discretion ................................................................34

1. Collection of Taxes Is Reserved Exclusively To The IRS .......34

2. A "Reasonable Approximation" Of Taxes Requires Application Of The Relevant Tax Code Provisions .................40

3. The Tax-Based Award Lacks Any Causal Link To The Securities Violations ....................................................44

B. The District Court's Conditional Trading-Profits Disgorgement Award Is An Abuse Of Discretion ........................................49

1. The Trading-Profits Award Lacks Any Causal Link To The Securities Violations ...........................................49

2. The SEC's Expert Employed An Unreliable Methodology ........................................................................52

3. The Trading-Profits Award Contradicts The Jury Finding On Beneficial Ownership ..........................................53

III. THE AWARD OF PREJUDGMENT INTEREST FOR A PERIOD OF 22 YEARS IS AN ABUSE OF DISCRETION .....................................55

IV. THE DISTRICT COURT ERRED IN DECIDING KEY SECTION 5 ISSUES AS A MATTER OF LAW .............................................................59

A. The District Court Erred In Granting Judgment That The Transactions Qualified As Distributions ..............................59

ii

B.     Judgment As A Matter of Law Was Improper Because Disputed Issues Of Fact Remained ................................................................. 63

V.    THE DISTRICT COURT ERRED IN ALLOWING THE SUBSTITUTION OF THE CHARLES WYLY ESTATE FOLLOWING HIS DEATH ......................................................... 65

CONCLUSION ...................................................................................... 66

# TABLE OF AUTHORITIES

**Page**

## Cases

*3M Co. (Minn. Min. & Mfg.) v. Browner*,
   17 F.3d 1453 (D.C. Cir. 1994) ........................................................27

*720 Lex Acquisition LLC v. Guess? Retail, Inc.*,
   No. 09-cv-7199 (AJN), 2014 WL 4184691 (S.D.N.Y. Aug. 22, 2014) .............52

*AMW Materials Testing, Inc. v. Town of Babylon*,
   584 F.3d 436 (2d Cir. 2009) .........................................................23

*Adams v. Woods*,
   2 Cranch 336, 2 L.Ed. 297 (1805) ..................................................31

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) .........................................................24

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
   369 U.S. 355 (1962) ................................................................53

*Blyden v. Mancusi*,
   186 F.3d 252 (2d Cir. 1999) .....................................................53, 54

*C.I.R. v. Shapiro*,
   424 U.S. 614 (1976) ................................................................41

*Corcoran v. N.Y. Power Auth.*,
   202 F.3d 530 (2d Cir. 1999) .........................................................23

*Crocker v. United States*,
   323 F. Supp. 718 (N.D. Miss. 1971) ................................................42

*Estate of Goodwyn v. C.I.R.*,
   T.C. Memo 1976-238, 1976 WL 3423 (1976) ..................................43

*Finley v. United States*,
   612 F.2d 166 (5th Cir. 1980) ........................................................42

*Gabelli v. SEC*,
   133 S. Ct. 1216 (2013) ....................................................25, 26, 31, 32

*Geiger v. SEC*,
   363 F.3d 481 (D.C. Cir. 2004) ......................................................61

*Gilligan, Will & Co v. SEC*,
   267 F.2d 461 (2d Cir. 1959) .....................................................61, 62, 63

*Highland Capital Mgmt. LP v. Schneider*,
   607 F.3d 322 (2d Cir. 2010) .........................................................23

iv

*Johnson v. SEC*,
  87 F.3d 484 (D.C. Cir. 1996) ...................................................31

*Meeker v. LeHigh Valley R.R. Co.*,
  236 U.S. 412 (1915) ..............................................................29

*Neuwirth Inv. Fund, Ltd. v. Swanton*,
  422 F. Supp. 1187 (S.D.N.Y. 1975) ........................................61

*Norte & Co. v. Huffines*,
  416 F.2d 1189 (2d Cir. 1969) .................................................56

*Olson v. Mellon*,
  4 F. Supp. 947, 950 (W.D. Pa. 1933) ......................................35

*Osterneck v. Ernst & Whinney*,
  489 U.S. 169 (1989) ..............................................................55

*Pfeiffer Co. v. United States*,
  518 F.2d 124 (8th Cir. 1975) .................................................41

*Piesco v. Koch*,
  12 F.3d 332 (2d Cir. 1993) ....................................................63

*SEC v. AbsoluteFuture.com*,
  393 F.3d 94 (2d Cir. 2004) ....................................................23

*SEC. v. Cavanagh*,
  445 F.3d 105 (2d Cir. 2006) ..................................................28

*SEC v. Contorinis*,
  743 F.3d 296 (2d Cir. 2014) ........................................24, 27, 29

*SEC v. Dibella*,
  No. 04-cv-1342 (EBB), 2008 WL 6965807 (D. Conn. Mar. 13, 2008) ............58

*SEC. v. First City Fin. Corp.*,
  890 F.2d 1215 (D.C. Cir. 1989) .............................................32

*SEC v. First Jersey Secs., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ..........................................55, 57

*SEC v. Fischbach Corp.*,
  133 F.3d 170 (2d Cir. 1997) ..................................................65

*SEC v. Graham*,
  21 F. Supp. 3d 1300 (S.D. Fla. 2014) ....................................28

*SEC v. Jones*,
  476 F. Supp. 2d 374 (S.D.N.Y. 2007) ....................................53

*SEC v. Lorin*,
  869 F. Supp. 1117 (S.D.N.Y. 1994) ......................................29

*SEC v. Monarch Funding Corp.,*
No. 85 Civ. 7072 (LBS), 1996 WL 562983 (S.D.N.Y. Oct. 3, 1996)...............58

*SEC v. Palmisano, ,*
135 F.3d 860 (2d Cir. 1998) ...........................................................................29

*SEC v. Patel,*
61 F.3d 137 (2d Cir. 1995) ..............................................................................45

*SEC v. Pentagon Capital Mgmt. PLC,*
725 F.3d 279 (2d Cir. 2013) .......................................................................26, 29

*SEC v. Ralston Purina Co.,*
346 U.S. 119 (1953)..........................................................................................61

*SEC v. Razmilovic,*
738 F.3d 14 (2d Cir. 2013) ................................................. 24, 32, 43, 44, 45, 51

*SEC v. Riordan,*
627 F.3d 1230 (D.C. Cir. 2010) ...................................................................28, 32

*SEC v. Univ. Major Indus. Corp.,*
546 F.2d 1044 (2d Cir. 1976) ..........................................................................61

*SEC v. Warde,*
151 F.3d 42 (2d Cir. 1998) ..............................................................................57

*U.S. ex rel. Lissack v. Sakura Global Capital Markets, Inc.,*
377 F.3d 145 (2d Cir. 2004) ......................................................................37, 38, 39

*U.S. ex rel. Mikes v. Straus,*
853 F. Supp. 115 (S.D.N.Y. 1994) ............................................................39, 41

*U.S. ex rel. Roberts v. W. Pac. R. Co.,*
190 F.2d 243 (9th Cir. 1951) ..........................................................................35

*U.S. ex rel. U.S.-Namibia (Sw. Africa) Trade & Cultural Council, Inc. v. Africa Fund,* 588 F. Supp. 1350 (S.D.N.Y. 1984)........................................................38

*Unicorn Tales, Inc., v. Banerjee,*
138 F.3d 467 (2d Cir. 1998) ............................................................................24

*United States. v. Bajakajian,*
524 U.S. 321 (1998)..........................................................................................30

*United States v. Contorinis,*
692 F.3d 136 (2d Cir. 2012) ............................................................................26

*United States v. Helmsley,*
941 F.2d 71 (2d Cir. 1991) ..............................................................................44

*United States v. Kalish,*
626 F.3d 165 (2d Cir. 2010) ............................................................................26

vi

*United States v. Letscher*,
   83 F. Supp. 2d 367 (S.D.N.Y. 1999) .................................................35

*United States v. NEC Corp.*,
   11 F.3d 136 (11th Cir. 1993) .........................................................65

*United States v. Price*,
   290 F.2d 525 (6th Cir. 1961) .........................................................65

*United States v. Ursery*,
   518 U.S. 267 (1996) ...............................................................26, 29

*Wickham Contracting Co. v. Local Union No. 3*,
   955 F.2d 831 (2d Cir. 1992) .......................................................55, 57

*Wolkstein v. Port of N.Y. Auth.*,
   178 F. Supp. 209 (D.N.J. 1959) .....................................................38

## **Statutes, Rules, and Regulations**

15 U.S.C. § 77b(a)(11) ...............................................................60

15 U.S.C. § 77d .........................................................................15

15 U.S.C. § 77d(a)(1) .................................................................59

15 U.S.C. § 77e .........................................................................59

15 U.S.C. § 77e(a) ..................................................................5, 12

15 U.S.C. § 77e(c) ..................................................................5, 12

15 U.S.C. § 77q .....................................................................5, 12

15 U.S.C. § 77t(d)(1) ...................................................................3

15 U.S.C. § 77v(a) ......................................................................3

15 U.S.C. § 78aa ........................................................................3

15 U.S.C. § 78j ......................................................................5, 12

15 U.S.C. § 78m(a) ..................................................................5, 12

15 U.S.C. § 78m(d) ..................................................................5, 12

15 U.S.C. § 78n(a) ..................................................................5, 12

15 U.S.C. § 78p(b) .......................................................................5

15 U.S.C. § 78u(d) ......................................................................3

15 U.S.C. § 78u(e) ......................................................................3

15 U.S.C. § 78u-1 ................................................................3

26 U.S.C. § 671 .................................................................43

26 U.S.C. § 674 .................................................17, 42, 43, 47

26 U.S.C. § 674(a) .............................................................47

26 U.S.C. § 674(c) .............................................................47

26 U.S.C. § 675(4) .............................................................47

26 U.S.C. § 6201(a) ...........................................................35

26 U.S.C. § 6211 ...............................................................42

26 U.S.C. § 6213 ...........................................................42, 43

26 U.S.C. § 6213(a) ...........................................................41

26 U.S.C. § 6213(c) ...........................................................43

26 U.S.C. § 6601 ...............................................................57

26 U.S.C. § 7401 ...............................17, 35, 36, 39, 40, 41, 57

26 U.S.C. § 7801(a) ...........................................................42

26 U.S.C. ch. 1, subch. B ....................................................42

28 U.S.C. § 1291 .................................................................3

28 U.S.C. § 2462 ........ 1, 3, 13, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 48

31 U.S.C. § 3729(d) ...........................................................37

17 C.F.R. § 230.144 ........................................................5, 12

17 C.F.R. § 240.10b-5 ..........................................................5

17 C.F.R. § 240.13a-1 ..........................................................6

17 C.F.R. § 240.13d-1 ..........................................................5

17 C.F.R. § 240.13d-2 ..........................................................5

17 C.F.R. § 240.13d-3 ......................................................4, 46

17 C.F.R. § 240.13d-3(a) ......................................................4

17 C.F.R. § 240.14a-3 ..........................................................5

17 C.F.R. § 240.14a-9 ..........................................................5

17 C.F.R. § 240.16a-1 ................................................................4

17 C.F.R. § 240.16a-3 ................................................................5

Act of February 28, 1839, § 4, 5 Stat. 322 .................................27

Federal Rule of Civil Procedure 25(a)(1) ..................................64

Federal Rule of Civil Procedure 50(a) .................................15, 23

Federal Rule of Civil Procedure 60(b) .......................................20

## **Constitutional Provisions**

U.S. Const. amend. VII ..............................................................54

## **Miscellaneous**

BLACK'S LAW DICTIONARY (9th ed. 2009) ...............................27

Jeremy Bentham, THE RATIONALE OF PUNISHMENT (Robert Heward ed., 1830)....27

Russell G. Ryan, *The Equity Façade of SEC Disgorgement*, 4 Harv. Bus. L. Rev.
   Online 10 (2013) ...................................................................28

*In Re Sec. Exch. Act of 1934*,
   Release No. 5808, 1977 WL 185650 (Feb. 24, 1977) ...........................5

*Definition of Terms "Underwriter" and "Brokers' Transactions,"*
   Release No. 33-5223, 1972 WL 125477 (Jan. 10, 1972) ......................62

*Survival of Actions Brought Under Federal Statutes,*
   63 Colum. L. Rev. 290 (1963) ..............................................65

ix

## PRELIMINARY STATEMENT

This is an appeal from a final judgment entered by the U.S. District Court for the Southern District of New York (Scheindlin, J.) in an enforcement action brought by the Securities and Exchange Commission ("SEC") against Samuel E. Wyly ("Sam Wyly") and the late Charles J. Wyly, Jr. ("Charles Wyly") (collectively, the "Wylys") in 2010 for conduct involving foreign trusts that began in the early 1990s. The district court awarded $187 million in "disgorgement" and more than $100 million in prejudgment interest covering a period of fully 22 years.

Ruling on an issue of first impression in this Circuit, the district court found inapplicable the five-year statute of limitations in 28 U.S.C. § 2462 for cases imposing a "civil fine, penalty, or forfeiture," reasoning that the simple expedient of styling the remedy "***disgorgement***" rather than "***forfeiture***" takes the case out of the statute, which would otherwise clearly bar the disgorgement award in this case. This Court should reverse and hold that the SEC may not so easily avoid the force of Congress's time limit on initiating actions of this type.

The district court also chose a novel measure of "disgorgement" unsupported by any precedent in this or any other Circuit, calculating the remedy for ***securities*** violations as the amount of ***taxes*** the Wylys allegedly avoided by transferring securities to foreign trusts. But that measure improperly usurps the

exclusive authority of the Internal Revenue Service ("IRS") to assess and collect taxes.  It also lacks any causal connection to the securities violations at issue.

Recognizing the vulnerability of its tax-based approach, the district court issued an alternative disgorgement order, based on the Wylys' supposed differential trading profits as compared with a hypothetical "buy-and-hold" investor, that would apply in the event that this Court vacates the tax-based disgorgement order.  That award, totaling more than $120 million plus $52 million in prejudgment interest, likewise bears no causal connection to the securities violations, and also rests on flawed expert testimony and contradicts an express jury finding as to whether the Wylys obtained a new interest in securities transferred offshore.

By either measure, the court's orders require payment of sums that greatly exceed any relation to the securities violations.  This Court, if it does not reverse the judgment as time-barred, should vacate both awards.

Finally, the district court awarded $16.8 million in disgorgement plus $7.3 million in prejudgment interest for the sale of unregistered securities, improperly taking away from the jury the question of whether those sales were "distributions" triggering SEC-filing requirements.  This error too warrants this Court's reversal.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 15 U.S.C. §§ 77t(d)(1) and 77v(a) and 15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. The district court entered final judgment on February 26, 2015 (ECF.591) and denied Appellants' motion for judgment as a matter of law or new trial on July 7, 2015 (ECF.622). On September 4, 2015, Appellants filed a timely notice of appeal. (ECF.630).

## ISSUES PRESENTED

1.     Whether the five-year statute of limitations under 28 U.S.C. § 2462 for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise" applies to this action for "disgorgement."

2.     Whether the "disgorgement" remedies for securities violations here are improper (a) if based upon the amount of taxes supposedly avoided by the violations and (b) if based on the supposed differential trading profits obtained compared to a hypothetical "buy-and-hold" investor.

3.     Whether the award of prejudgment interest for a period of 22 years is improper.

3

4.      Whether the jury should have been permitted to decide whether sales of unregistered shares were distributions subject to Section 5 of the Securities Act of 1933.

5.      Whether Charles Wyly's death should have terminated this action against his estate.

## STATEMENT OF THE CASE

### A.      Statutory And Regulatory Background

This case involves a judgment after jury trial for violation of a variety of provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), and rules thereunder, arising from the Wylys' use of offshore trusts to transfer securities that the SEC accused the Wylys of having beneficially owned without so disclosing.

A beneficial owner of a security is one who has (i) voting power and/or (ii) investment power (i.e., the power to dispose or direct the disposition of such security).  17 C.F.R. § 240.13d-3; *see also* 17 C.F.R. § 240.16a-1 (referring to Rule 13d-3 to define beneficial ownership).  Such power to vote or dispose of securities may result through legal ownership of such securities or through "any contract, arrangement, understanding, relationship, or otherwise."  17 C.F.R. § 240.13d-3(a).

Beneficial owners of more than five percent of any class of registered equity securities must file with the SEC a Schedule 13D (plus amendments for any

material changes), and any director or officer of the issuer of such securities must initially report beneficial ownership to the SEC on a Form 3 and any statement of changes on a Form 4. *See* 17 C.F.R. §§ 240.13d-1, 240.13d-2, 240.16a-3. The Section 13(d), 15 U.S.C. § 78m(d), reporting requirements are designed to ensure disclosure to stockholders in connection with takeover attempts and any substantial acquisition of securities of an issuer. *See In Re Sec. Exch. Act of 1934*, Release No. 5808, 1977 WL 185650, at \*3 n.2 (Feb. 24, 1977). The requirements under Section 16(a) are intended to prevent the unfair use of inside information by officers and directors. 15 U.S.C. § 78p(b).

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q, provide the general anti-fraud provisions enforced by the SEC, including prohibitions against making untrue statements of material facts or omitting material facts so as to mislead. *See* 17 C.F.R. § 240.10b-5. Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), make the sale of unregistered securities unlawful and require the filing of a registration statement, subject to certain exemptions. *See* 17 C.F.R. § 230.144. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), prohibits the solicitation of proxies with respect to registered securities in contravention of SEC regulations involving the filing and content of proxy statements. *See* 17 C.F.R. §§ 240.14a-3, 240.14a-9. Finally, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires issuers of

registered securities to file annual reports (commonly known as Form 10-Ks) disclosing, among other things, information regarding the beneficial ownership by individuals holding more than five percent of the issuer's securities. *See also* 17 C.F.R. § 240.13a-1.

### B.    Factual Background

Entrepreneurs born and raised in rural Louisiana (4/22/14.Tr.1630-34), Sam and the late Charles Wyly debuted their first venture, University Computing Company, in 1965 (4/22/14.Tr.1636-38), and followed their initial success with many others, co-founding Sterling Software, Inc. with a former employee, Sterling Williams, in 1981 (ECF.270-1.at.¶¶4, 8). In 1996, Sterling Software completed an initial public offering in which it spun off its electronic commerce division into a separate company—Sterling Commerce, Inc. ECF.270-1.at.¶2. In 1983, the Wylys acquired a controlling stake in Michaels Stores, Inc., the national chain of crafts retailers (4/22/14.Tr.1666; ECF.270-1.at.¶¶5, 9), and in 1998, the Wylys took public Scottish Re (f/k/a Scottish Annuity and Life Holdings, Ltd.) (4/22/14.Tr.1701-03). Michaels, Sterling Software, Sterling Commerce, and Scottish Re were publicly traded companies subject to SEC reporting requirements. ECF.270-1.at.¶1. The Wylys served on each company's Board of Directors. ECF.270-1.at.¶¶ 4-11.

The Wylys established an office in Dallas, Texas, to assist them with tax returns, financial planning, and SEC filings in connection with their roles on the boards of the public companies. 4/7/14.Tr.148; 4/22/14.Tr.1652-60; 8/4/14.Tr.3388-90. Starting in the early 1990s, Sharyl Robertson ("Robertson") served as the CFO of the Wyly family office and attorney Michael French ("French") worked in the family office as the Wylys' lawyer for personal and business matters. 4/7/14.Tr.149; 4/22/14.Tr.1651-52. The Wylys relied on the accountants and lawyers they employed to file tax returns and reports with the IRS and SEC. 4/17/14.Tr.1184-85; 4/22/14.Tr.1652-54; PX-0542R.

In June of 1991, Robertson attended a seminar run by attorney David Tedder ("Tedder") regarding a tax deferral and asset protection system involving the establishment of offshore trusts. 4/7/14.Tr.156-60. Robertson prepared a memorandum for the Wylys and French on Tedder's presentation, recommending the Wylys attend a future seminar. 4/7/14.Tr.156-62; PX-0008. In the fall of 1991, the Wylys, Robertson, and French attended a Tedder seminar held in New Orleans. 4/7/14.Tr.168-69; 4/22/14.Tr.1716-18. At a subsequent meeting with the Wylys and French, Tedder explained his system of establishing foreign non-grantor trusts that would provide tax deferral and asset protection through the transfer of assets, primarily securities, to the trusts in exchange for private annuities. 4/22/14.Tr.1687, 1718-19. After consulting French's law firm

7

(4/10/14.Tr.729-35, 739-57; PX-0010), the Wylys each settled the first in a series of offshore trusts in March 1992 in the Isle of Man, a self-governing British Crown dependency located in the Irish Sea between Great Britain and Ireland ("IOM Trusts") (ECF.270-1.at.¶¶18-20, 36).

Under such trusts, a settlor or grantor provides assets for a trustee to administer for the benefit of any named beneficiaries. A trustee takes legal title to the assets contributed by the settlor and is responsible for those assets on behalf of the beneficiaries. JX-005.at.8. The IOM Trusts each had a committee of "protectors" tasked with giving investment advice and making recommendations to the trustees as well as auditing the trustees' books and records. 4/7/14.Tr.176; 4/8/14.Tr.384; PX-0542R.at.5. French and Robertson initially served as protectors. ECF.270-1.at.¶49.

In 1992, the Wylys hired Tedder and his partner Michael Chatzky to advise them on tax matters associated with the IOM Trusts, and they issued legal opinions for the Wylys regarding the tax treatment of the trusts and certain private annuities in exchange for the transfer of options for Michaels Stores common stock. PX-0013; 4/7/14.Tr.169-70. In April 1992, the Wylys transferred stock options in Michaels Stores and Sterling Software to corporate subsidiaries of the first two trusts, which issued private annuities to the Wylys in consideration for the transferred options. ECF.270-1.at.¶60; PX-4312.at.6.

8

In connection with these April 1992 transactions, French sought advice from his law firm as to what disclosures the IOM Trusts would be required to file with the SEC. PX-0012. The Wylys, through the lawyers at French's law firm, filed disclosures with the SEC documenting the transfer of the options and disclaiming any role as beneficiary or trustee of the two IOM trusts. PX-0040; DX-5. French's law firm filed the required disclosures with the SEC on behalf of the trusts and their trustee. JX-008.at.7-10; DX-293; PX-0036; PX-0037; PX-0038; PX-0041; PX-0042; DX-4; DX-20.

Between 1992 and 1999, the Wylys similarly sold and transferred stock options in Michaels Stores, Sterling Software, and Sterling Commerce to the IOM Trusts and their related corporate subsidiaries. ECF.270-1.at.¶59; PX-4312.at.6-8. In March and December 1996, the IOM Trusts purchased additional shares of Michaels Stores directly from the company in private placements. ECF.270-1.at.¶¶66, 69. Although other Michaels shares were trading on the market pursuant to a registration statement at this time, these particular shares and options were not registered with the SEC and were therefore "restricted." ECF.270-1.at.¶¶67, 68, 70. From 1997 to 2000, the IOM Trusts sold many of the unregistered Michaels shares pursuant to SEC Rule 144, which allows for public resale of restricted and control securities if a number of conditions are met. ECF.270-1.at.¶¶66-81; 4/29/14.Tr.2247-55; 4/8/14.Tr.477-84.

9

In August 2003, the Wylys directed their tax attorneys to approach the IRS regarding the tax treatment of the IOM Trusts.  8/4/2014.Tr.3453-54, 3459-60; PX-1260.  In October 2003, Sam Wyly filed a disclosure statement with the IRS, noting that he was the settlor of a foreign non-grantor trust known as the Bulldog Trust and that a question had been raised regarding the tax treatment of that trust. 8/4/14.Tr.3475-77; DX-1153.  In February 2004, the IRS began an audit of the year 2000 tax returns for Charles Wyly and his wife with respect to certain transactions related to the IOM Trusts.  8/4/14 Tr.3485-86; PX-9082.  The IRS subsequently opened an audit of Sam Wyly's tax returns, and sent several Information Document Requests to the Wylys, to which the Wylys responded promptly.  8/4/14.Tr.3485-87; PX-1373.

In April 2005, the Wylys made an amendment to their Schedule 13D for Michaels Stores, providing additional information and reports that would have been required if the Wylys were deemed to be beneficial owners of the Michaels Stores stock and options that were previously transferred to the IOM Trusts. PX-4312.[1]

---

[1]    Similar amendments were not filed in connection with Sterling Software, Sterling Commerce, and Scottish Re because the Wylys were no longer directors of those companies by 2005 and Schedule 13D filings were no longer required as to those companies.  4/22/14.Tr.1613.

10

Following the April 2005 Schedule 13D amendment, other governmental agencies began investigations of the IOM Trusts, with which the Wylys cooperated. 8/5/14.Tr.3626-28. The Wylys entered into an agreement with the SEC that tolled the statute of limitations, effective February 1, 2006. ECF.127-6.at.2-3.

## C.    The SEC Complaint

Four-and-a-half years later, on July 29, 2010, the SEC filed a civil complaint against the Wylys, French, and the Wylys' broker (collectively, "Defendants"), including ten claims against the Wylys for alleged violations of the securities laws. ECF.1. The complaint alleged that the Wylys were beneficial owners of the securities held in the IOM Trusts and had failed to make the requisite filings of amendments to their Schedule 13Ds and Form 4s when the IOM Trusts engaged in transactions. ECF.1.at.¶¶137-42, 154-57.

There is no dispute that it was public information that the Wylys controlled a large percentage of the shares of the public companies at issue and that trusts associated with the Wylys had purchased shares in private placements. 4/8/14.Tr.477-78; DX-528. The only information not publicly available was the extent of the holdings in the IOM Trusts—although some news reports during the time period included the ownership of shares in the IOM Trusts among the Wylys' holdings. 4/8/14.Tr.478-79; DX-558.

11

The SEC complaint charged the Wylys with securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q, based on alleged concealment of beneficial interest in the securities transactions in the offshore IOM Trusts.  ECF.1.at.¶¶120-26, ¶¶129-131. The SEC also alleged that the Wylys violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), by selling unregistered shares of Michaels stock using false Form 144s filed with the SEC.  ECF.1.at.¶¶132-36. (Under SEC Rule 144, an individual may sell otherwise unregistered securities pursuant to an exemption if certain conditions are met and a Form 144 is filed with the SEC.  *See* 17 C.F.R. § 230.144.).  The complaint further alleged that the Wylys had aided and abetted the trustees' violations of Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), by providing false information and forms to file with the SEC disclaiming the Wylys' beneficial ownership of securities held by the IOM Trusts.  ECF.1.at.¶¶149-53.  Finally, the complaint alleged violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), for filing false proxy statements and aiding and abetting violations of Section 13(a), 15 U.S.C. § 78m(a), for filing of false annual reports—all again based on the Wylys' alleged concealment of their beneficial ownership of securities held by the IOM Trusts.  ECF.1.at.¶¶160-67.

## D.    Procedural History

A year after the SEC filed its complaint, on August 7, 2011, Charles Wyly was killed in an automobile accident near Aspen, Colorado.    ECF.89.at.1; 5/1/14.Tr.2620.    The district court granted the SEC's request (ECF.77.at.2) to substitute Donald R. Miller, Jr., executor of the Charles Wylye Estate, as a party defendant, holding that the SEC's claim for disgorgement did not abate upon the death of Charles Wyly and could be pursued against the Estate.  ECF.89.at.20.[2]

On March 5, 2013, Appellants moved for partial summary judgment on the ground that claims for civil penalties and injunctive relief were time-barred under 28 U.S.C. § 2462 and that the SEC's request for disgorgement of alleged tax deficiencies was improper.  ECF.138.at.1.  As to the time bar, the district court held the SEC precluded from seeking "penalties" from the Wylys for violations prior to February 1, 2001, or five years prior to the parties' tolling agreement. ECF.190.at.44.    The district court, however, permitted the SEC to seek "disgorgement" of unpaid taxes during that period, reasoning that such an unprecedented remedy was not an action for a "penalty" covered by the statute,

---

[2]   On October 28, 2014, the district court also permitted the SEC to amend the complaint to add a number of "relief defendants" against whom the SEC sought to obtain and enforce an asset freeze order.  ECF.517.  The district court has permitted discovery as to the new relief defendants to allow for the tracing  of assets.  ECF.518.  The relief defendants appealed the asset freeze order to this Court in November 2014.  ECF.529; ECF.530.

ECF.193.at.7-13, but rather "a civil action for securities laws violations, the *remedy* for which is measured by the amount of taxes avoided." ECF.193.at.8 (emphasis in original).

On January 9, 2014, the district court entered a consent judgment against the Wylys' broker, who neither admitted nor denied the allegations in the complaint. ECF.231; ECF.233. On March 21, 2014, the district court entered a consent judgment against French, who admitted to certain conduct and agreed to cooperate with the SEC. ECF.279; ECF.280. The Wylys and the SEC proceeded to trial on the SEC's claims. The liabilities and remedies phases of the trial were bifurcated with the liability phase tried to a jury beginning in March 2014. ECF.476.at.2.

### E. The Jury Trial On Liability

From March 24 to May 12, 2014, the district court held a jury trial on nine of the ten claims against the Wylys (the Section 10(b) and 17(a) fraud claims, the Section 13(d), 14(a), and 16(a) nondisclosure claims, and the Section 5 claim relating to the sale of unregistered securities). The SEC also sought to elicit testimony on the connection between the Wylys' SEC reporting and the tax benefits of the IOM Trusts. At trial, French, who at that point was cooperating with the SEC, testified that he had raised the issue of SEC reporting with Tedder during the 1991 meeting at Sam Wyly's home in California and that Tedder had stated that SEC filings could jeopardize the tax benefits associated with the Isle of

14

Man Trusts.[3]  4/22/14.Tr.1719-21, 4/23/14.Tr.1884.  Sam Wyly disputed that testimony when he took the stand in his own defense (4/23/14.Tr.1821-22; 4/28/14.Tr.1976; 4/30/14.Tr.2344-45, 2350), but did not dispute that his lawyers, with his knowledge, attempted to keep ownership of securities in the public companies below five percent of the total outstanding amount in order to minimize the reporting required by the SEC rules (4/22/14.Tr.1609).  Employees of the Wylys' family office testified that the Wylys' legal counsel specifically advised it would be proper to keep the IOM Trusts' ownership below five percent in order to avoid onerous SEC filing requirements.  4/7/14.Tr.256; 4/16/14.Tr.1161-62.

On May 5, 2014, the Wylys and the SEC moved for judgment as a matter of law under Rule 50(a).  5/6/14.Tr.2990-94.  The SEC moved for judgment on the Section 5 claims, which concerned the IOM Trusts' sales, through their broker, of unregistered shares of Michaels Stores that the Trusts had acquired directly from Michaels Stores in two private placements in April and December 1996.  *See* ECF.295.at.4; ECF.298.at.1-2; ECF476.at.48-50.  The Wylys had contended (ECF.292.at.1) that any non-compliance was excused by Section 4(1) of the Securities Act, 15 U.S.C. § 77d, which exempts from the Section 5 registration requirement "transactions other than by an issuer, underwriter, or dealer."  Despite

---

[3]  This hearsay testimony was allowed in solely for its effect on the Wylys' state of mind.  4/22/14.Tr.1719-1721.

earlier holding that whether the sale was a "distribution" (and thus not covered by the exemption) would be a question for the jury, ECF.292.at.4, the district court held as a matter of law that the 1997 Michaels Stores stock sale was a "distribution," 5/6/14.Tr.2990-91.

The district court granted the Wylys' motion for judgment on the Section 16(a) claims, holding that the Wylys could not be held liable for not reporting transactions of certain irrevocable trusts of which they were settlors but not beneficiaries. 5/6/14.Tr.2995. The court reserved judgment on the remaining motions for judgment as a matter of law. 5/6/14.Tr.2990-94.

On May 12, 2014, the jury returned a verdict against both Sam Wyly and the Estate on all claims. 5/12/14.Tr.3297-3311. In a 22-page special verdict form, the jury answered "yes" to all but one question regarding the nine claims against the Wylys. ECF.473. The jury specifically found that the Wylys were beneficial owners of the IOM Trusts. ECF.473.at.9. The jury answered "no" only to the question whether the Section 4(1) exemption applied to the Section 5 claim for the sale of unregistered securities. ECF.473.at.16.

On July 10, 2014, the district court dismissed with prejudice the SEC's single insider trading claim, which had been tried to the bench. ECF.405.at.27.

### F.     The Bench Trials On Remedies

Following the jury trial, the district court held two separate bench trials to determine remedies.  ECF.476; ECF.563.  The district court permitted the SEC to seek disgorgement based on two alternative theories: the amount of tax payments the Wylys allegedly had avoided by transferring assets overseas and trading profits from the sale of registered securities.

### 1.     The Tax-Based Disgorgement Order

The SEC first proposed a measure of disgorgement based on "the amount of federal income taxes that the Wylys allegedly avoided" by transferring options to the trusts.  ECF.193.at.2.  In August 2014, the district court held a six-day bench trial on that tax-based disgorgement theory.  In an order entered September 25, 2014, the district court adopted that theory, ordering Sam Wyly to disgorge $123,836,958.76 and the Estate to disgorge $63,396,733.97, plus prejudgment interest.  ECF.476.  The district court concluded that the IOM Trusts qualified as grantor trusts under the Tax Code, 26 U.S.C. § 674, meaning that the Wylys should have been taxed on the assets in the trusts, unless an exception applied. ECF.476.at.62-67.   The district court then "approximate[d] unpaid taxes by applying the rate the Wylys would have had to pay if they owned the shares personally, which requires applying the ordinary income *or* capital gains rate for the taxable year."  ECF.476.at.67 & n.218.

17

In reaching that holding, the district court determined that that Tax Code allowed securities-law disgorgement based on unpaid taxes, even though Section 7401 of the Tax Code, 26 U.S.C. § 7401, states that "[n]o civil action for the collection or recovery of taxes, or of any fine, penalty or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General [of the United States] or his delegates directs that the action be commenced." ECF.476.at.58. The district court held that permitting disgorgement based on avoided taxes would not result in duplicative recovery to the government because the Wylys might offset the disgorgement against any tax liability or potentially ask the district court to vacate the judgment. ECF.476.at.61-62 & n.205.

The district court also awarded disgorgement of a portion of the profits realized upon the sale of the unregistered securities. ECF.476.at.74.

In addition to the disgorgement amounts, the district court awarded pre-judgment interest for a 22-year period at the LIBOR rate totaling $104,746,802.38. ECF.486.at.1-2; ECF.591.at.2-4.

## 2. The Trading-Profits Disgorgement Order

Despite finding that there was no evidence that the Wylys' nondisclosure of beneficial ownership "resulted in any market distortion, price impact, or profit tied to the violation," ECF.436.at.16, the district court allowed the SEC "one final

18

opportunity" to pursue disgorgement of trading profits," ECF.436.at.21. The SEC proposed several alternative disgorgement theories, ECF.456.at.2-3, later dropping one based on the theory that shareholders were "misled" as to the total number of shares the Wylys held in approving stock option plans, ECF.456.at.2. The district court then dismissed as untimely one based on the Wylys' alleged concealment to avoid depressing stock prices, and another based on the assumption that the Wylys had exercised their options before transferring the securities to the IOM Trusts. ECF.476.at.81 n.253. Eventually, the district court allowed the SEC to proceed with a theory of disgorgement based on the difference between the Wylys' rate of return and that of an average "buy-and-hold" investor in the same securities during the same time period. ECF456.at.2; ECF.563.at.6.

The district court held another bench trial over three days in November and December 2014 on the alternative trading-profits disgorgement theory and issued an order providing conditionally for a trading-profits disgorgement award "in the event that a higher court disagrees with the measure of disgorgement imposed by the September 25 [tax-based disgorgement] Order." ECF.563.at.6. At the trial, the SEC's expert Dr. Chyhe Becker sought to measure the Wyly's profits by calculating the difference between the Wylys' returns from their offshore transactions in the public companies' securities and the returns that an ordinary buy-and-hold equity investor would have earned in those securities.

19

11/12/14.Tr.97-98. In a December 19, 2014 order, the district court relied upon the SEC's trading-profits theory to set a reasonable approximation of the trading profits causally connected to the Wylys' securities laws violations, even while noting that the SEC expert's methodology was "flaw[ed]," ECF.563.at.50.

### G.    Post-Trial Proceedings

In October 2014, following the tax-avoidance disgorgement order, both Sam Wyly and Caroline Wyly, the wife of the late Charles Wyly Jr., filed Chapter 11 bankruptcy petitions in Texas. ECF.627-1.at.2. On May 29, 2015, the IRS filed a motion for partial summary judgment in the bankruptcy proceedings, seeking to bind Sam Wyly and Caroline Wyly to the specific factual findings made by the district court in the tax-based disgorgement order. ECF.627-1.at.3. On August 24, 2015, the bankruptcy court ruled that it would give preclusive effect to the district court's rulings on the tax status of the Wylys' Trusts. ECF.627-1.at.38. The bankruptcy court, however, declined to give preclusive effect to the amount of taxes owed, as identified as a basis for the disgorgement order. ECF.627-1.at.16. The bankruptcy court reached this conclusion despite the fact that the district court contemplated that another court might reach a different conclusion as to tax liability. ECF.627-1.at.33-38; ECF.476.at.62 n.205. Following the bankruptcy court's order on collateral estoppel, Appellants asked the district court for permission to file a Rule 60(b) motion for relief from the judgment on the

grounds that the district court did not intend to bind the bankruptcy court. ECF.628.at.2. The court declined to grant such relief. *In re Samuel E. Wyly*, No. 14-35043-bjh11, ECF 798-2 (N.D. Tex. Bankr. Aug. 28, 2015) (filing of district court conference transcript, denying request for relief from judgment).

Following the May 2014 jury verdict and the district court's September 2014 and December 2014 remedies orders, the SEC moved for entry of final judgment, which the district court granted on February 26, 2015. ECF.590.at.1. In its decision, the district court noted that the IRS had not determined whether the IOM Trusts were tax-exempt, and the district court provided that, in the event there was such an IRS determination, the IRS may take notice that there should be an offset for amounts paid by the Wylys to the SEC. ECF.590.at.6-7. In addition, the district court allowed the Wylys to move to vacate the final judgment in the event that the IRS does not provide for an offset. ECF.590.at.7.

On July 7, 2015 the District Court entered an order denying the Wylys' motion for judgment as a matter of law or new trial. ECF.622. Sam Wyly and the Estate filed a timely notice of appeal on September 4, 2015. ECF.629.

## SUMMARY OF ARGUMENT

*First*, this Court should hold the SEC's claims time-barred as to all conduct prior to February 1, 2001, for the district court erred in finding inapplicable to an action for "disgorgement" the five-year statute of limitations in 28 U.S.C. § 2462

21

that applies to an action for a "fine, penalty, or forfeiture." Disgorgement and "forfeiture" are historically synonymous, and even assuming that disgorgement is remedial, Section 2462 does not limit "forfeitures" to punitive rather than remedial forfeitures, which have antecedents going back to the early days of the republic. And even if the statute of limitations in Section 2462 is construed to extend only to actions for "penalties" and punitive forfeitures, the disgorgement here was so disconnected from any remedial purpose that it has a punitive element that places it within the statute so construed.

*Second*, this Court should vacate both of the district court's two alternative disgorgement orders. The first purported to award disgorgement based on supposedly avoided taxes, but that unprecedented metric improperly usurps the IRS's exclusive authority to assess and collect taxes. Even were such a tax-based award permissible, the district court erred in finding any causal connection between the securities disclosure violations found by the jury and the supposed "tax benefits" enjoyed by the Wylys. The same is true for the alternative award, which sought to disgorge supposed trading profits based on an unreliable methodology that made an inaccurate and apples-to-oranges comparison between the Wylys and a hypothetical "buy-and-hold" investor, and which disregarded a relevant jury finding.

22

*Third*, the district court abused its discretion in awarding prejudgment interest exceeding $100 million for a 22-year period starting in the early 1990s, an award that failed to take relevant factors into account.

*Fourth*, on the Section 5 claims, the district court wrongly took away from the jury a key question affecting the proper treatment of the sale of unregistered securities for SEC filing purposes, and resolved disputed questions of fact as to whether an exemption applied.

*Finally*, to the extent the disgorgement orders in fact operate as penalties, the district court erred in substituting the Estate of Charles Wyly as a party to this action following his death.

## STANDARD OF REVIEW

This Court reviews de novo the district court's determination of the appropriate statute of limitations. *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 542 (2d Cir. 1999). It also reviews de novo a challenge on Seventh Amendment grounds, *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 451 (2d Cir. 2009), and a decision on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010).

This Court reviews for abuse of discretion the district court's imposition and calculation of disgorgement liability. *SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96

(2d Cir. 2004). This Court also reviews for abuse of discretion the grant of an award of prejudgment interest and the interest rate, *SEC v. Contorinis*, 743 F.3d 296, 307 (2d Cir. 2014), as well as the district court's admission of expert testimony, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002). To the extent that the district court has proceeded on an erroneous legal assumption, that necessarily constitutes an abuse of discretion. *See SEC v. Razmilovic*, 738 F.3d 14, 25 (2d Cir. 2013).

This Court reviews de novo the district court's legal interpretation of the Federal Rule of Civil Procedure permitting substitution of parties and findings of fact for clear error. *Unicorn Tales, Inc., v. Banerjee*, 138 F.3d 467, 469 (2d Cir. 1998).

## ARGUMENT

I.  **THE SEC'S CLAIMS FOR DISGORGEMENT ARE TIME-BARRED AS TO ANY CONDUCT BEFORE FEBRUARY 1, 2001 UNDER THE FIVE-YEAR STATUTE OF LIMITATIONS SET FORTH IN 28 U.S.C. § 2462**

There is no dispute that, as to any conduct prior to February 1, 2001, the statute of limitations on an action for the enforcement of "any civil fine, penalty, or forfeiture," 28 U.S.C. § 2462, expired before the SEC filed this lawsuit in July 2010. Section 2462 provides that, "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless

24

commenced within five years from the date when the claim first accrued . . . ." *Id.* Because the SEC signed a tolling agreement with the Wylys that took effect February 1, 2006, claims for a "fine, penalty, or forfeiture" are time-barred for conduct occurring before February 1, 2001. Yet the district court imposed disgorgement based on conduct that occurred *mostly **in the 1990s***, reasoning that "disgorgement" does not amount to "forfeiture" within the meaning of Section 2462 and thus that the SEC had the authority to bring its action at any time, unconstrained by the statute of limitations.

This Court should reverse and hold that, as to all pre-February 1, 2001 conduct, this is a time-barred "forfeiture" action by another name. Alternatively, this Court should hold that in the particular circumstances here, the disgorgement orders constitute a "penalty" within the meaning of Section 2462 because insufficiently tied to any remedial purpose, likewise making this action untimely as to pre-February 1, 2001 conduct.

## A. The Disgorgement Awards Are "Forfeitures" Within The Meaning Of 28 U.S.C. § 2462

The Supreme Court has held that the five-year statute of limitations in Section 2462 accrues when the conduct occurs and applies to ***civil penalty*** actions by the SEC. *Gabelli v. SEC*, 133 S. Ct. 1216, 1220 (2013). The Court left open in *Gabelli* whether Section 2462 applies to claims for ***disgorgement***. *Id*. at 1220 n.1. This Court similarly has declined to decide whether disgorgement constitutes a

25

civil forfeiture. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013). The issue is thus one of first impression for this Court.

Applying *Gabelli* here, the district court correctly ruled that the SEC's claims for fines, penalties, or forfeitures against the Wylys were time-barred for any securities violations that occurred prior to February 1, 2001. ECF.190.at.19-20. But the court held that Section 2462 does not apply to the SEC's disgorgement requests, reasoning that disgorgement is an equitable remedy that merely prevents unjust enrichment. ECF.476.at 4-6. This Court should now reverse and hold that Congress has foreclosed "disgorgement" actions filed outside the five-year statute of limitations no less than it has foreclosed "forfeiture" actions.

### 1. "Forfeiture" And "Disgorgement" Are Synonymous

As the Supreme Court has recognized, the terms "disgorgement" and "forfeiture" may be used interchangeably. *See United States v. Ursery*, 518 U.S. 267, 284 (1996). "[Civil f]orfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct." *Id*. This Court similarly has used the terms as synonyms, even describing a criminal forfeiture as a type of disgorgement. *See United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) ("Criminal forfeiture focuses on the disgorgement by a defendant of his 'ill-gotten gains.'") (quoting *United States v. Kalish*, 626 F.3d 165, 170 (2d Cir. 2010)). As a

26

member of this Court recently explained, "[b]oth forfeiture and disgorgement seek to force a defendant to give up—that is, to forfeit or to disgorge—what he has wrongfully gained." *Contorinis*, 743 F.3d at 310 (Chin, J., dissenting). Legal dictionaries confirm that the two words have equivalent meanings. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) ("forfeiture: 1. The divestiture of property without compensation.") ("disgorgement: The act of giving up something (such as profits illegally obtained) on demand or by legal compulsion.").

Thus, the term "forfeiture" in Section 2462 is best read to encompass "disgorgement" as a virtual synonym—the same remedy by a different name. The absence of separate reference to the term "disgorgement" in Section 2462 is best explained by the fact that the term "disgorgement" had not gained currency at the time Congress enacted the predecessor statute in 1839.[4] In the first half of the 19th century, "disgorgement" was not a widely used legal term, but "forfeiture" had a broad meaning, encompassing any situation "when a man is, by a judicial sentence, compelled to pay a sum of money to another . . . ." Jeremy Bentham, THE

---

[4] The 1839 version of the statute read: "No suit or prosecution shall be maintained, for any penalty or forfeiture, pecuniary or otherwise, accruing under the laws of the United States, unless the same suit or prosecution shall be commenced within five years from the time when the penalty or forfeiture accrued." Act of February 28, 1839, § 4, 5 Stat. 322. Section 2462, enacted in 1948, included mere "changes in phraseology" that did not change the meaning of the statute from its predecessor. *3M Co. (Minn. Min. & Mfg.) v. Browner*, 17 F.3d 1453, 1458 (D.C. Cir. 1994).

RATIONALE OF PUNISHMENT 252-58 (Robert Heward ed., 1830).   By contrast, the first disgorgement of ill-gotten gains in the securities context did not occur until the 1970s.   *See* Russell G. Ryan, *The Equity Façade of SEC Disgorgement*, 4 Harv. Bus. L. Rev. Online 10, nn.60-61 (2013); *see also SEC. v. Cavanagh*, 445 F.3d 105, 118 (2d Cir. 2006) ("[A]lthough the term 'disgorgement' became common only recently, equity courts have traditionally awarded analogous forms of relief under a variety of names.").

Thus the five-year statute of limitations in Section 2462 is properly read to cover any attempt by the Government to reach back and recover allegedly ill-gotten gains, whether labeled "forfeiture" or "disgorgement."  For these reasons, at least one district court has concluded that "[t]he disgorgement of all ill-gotten gains realized from the alleged violations of the securities laws—i.e., requiring defendants to relinquish money and property—can truly be regarded as nothing other than a forfeiture (both pecuniary and otherwise), which remedy is expressly covered by § 2462." *SEC v. Graham*, 21 F. Supp. 3d 1300, 1311 (S.D. Fla. 2014), *appeal docketed* No. 14-13562 (11th Cir.); *see also SEC v. Riordan*, 627 F.3d 1230, 1234 n.1 (D.C. Cir. 2010) (noting that "[i]t could be argued that disgorgement is a kind of forfeiture covered by § 2462, at least where the sanctioned party is disgorging profits not to make the wronged party whole, but to fill the Federal Government's coffers").

## 2.    A "Forfeiture" May Be Remedial Rather Than Punitive

The district court's sole reason for holding Section 2462 inapplicable was that disgorgement is remedial and not punitive.  The court reasoned that, "due to its remedial nature, disgorgement does not constitute a penalty, and is not analogous to *criminal* forfeiture."  ECF.476.at.4 (citing *Pentagon Capital Mgmt.*, 725 F.3d at 288 n.8; *Contorinis*, 743 F.3d at 306-07).  The court relied upon this Court's decision in *Contorinis*, which distinguished a "'fine, penalty or forfeiture'" from "disgorgement, which 'merely deprives one of wrongfully obtained proceeds.'" 743 F.3d at 306 (quoting *SEC v. Lorin*, 869 F. Supp. 1117, 1121 (S.D.N.Y. 1994)). But *Contorinis* did not consider or rule upon the meaning of Section 2462, and that section is not limited by its terms to punitive actions.[5]

To the contrary, it is well-settled that the term "forfeiture" may extend to remedial as well as punitive actions.  The Supreme Court has held, for example, that "civil forfeitures are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause."  *Ursery*, 518 U.S. at 270-71; *see also SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998) (explaining that "in *Ursery*, the Court ruled that the property forfeitures authorized . . . to require disgorgement of the fruits of

---

[5]   In stating in *Meeker v. LeHigh Valley R.R. Co.*, 236 U.S. 412, 423 (1915), that "[t]he words 'penalty or forfeiture' in [§ 2462] refer to something imposed in a punitive way for an infraction of a public law," the Supreme Court was merely making the point that the section does not extend to private lawsuits aimed at "redressing a private injury," *id*., as opposed to government actions.

illegal conduct, are properly classified as civil penalties, not as criminal punishment") (citation and quotation marks omitted).  And in *United States. v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court reviewed at length the use of forfeitures in the early days of the republic as a remedy rather than a punishment for customs violations:  "the early monetary forfeitures [] were considered not as punishment for an offense, but rather as serving the remedial purpose of reimbursing the Government for the losses accruing from the evasion of customs duties."  *Id.* at 342.  While *Bajakajian* held punitive (and thus subject to the Excessive Fines Clause) a forfeiture of $357,142 of currency taken abroad for failure to satisfy a statutory reporting requirement, *id.* at 329 (reasoning that it did "not serve the remedial purpose of compensating the Government for a loss"), the Court expressly noted that the term "forfeiture" may operate as punitive or remedial depending on the context.

It follows that disgorgement orders cannot be distinguished from "forfeitures" on the ground that they are remedial rather than punitive.  The district court thus erred in holding disgorgement is not subject to Section 2462's five-year limitations period because it is remedial in nature.[6]

---

[6]  Decisions holding that disgorgement does not qualify as a "penalty" for Section 2462 purposes, *see, e.g., Johnson v. SEC*, 87 F.3d 484, 491-92  (D.C. Cir. 1996), do not reach or decide the question whether disgorgement comes within the meaning of the term "forfeiture."

### 3.   Exempting "Disgorgement" From Section 2462 Would Undermine The Purpose Of The Statute of Limitations

As the Supreme Court stated in *Gabelli*, it would be "utterly repugnant to the genius of our laws" if actions "for penalties" could "be brought at any distance of time."  *Gabelli*, 133 S. Ct. at 1223 (quoting *Adams v. Woods*, 2 Cranch 336, 342, 2 L.Ed. 297 (1805) (Marshall, C.J.)).  The district court offers no reason why it is not equally repugnant to allow the SEC a limitless time in which to bring an action for "disgorgement"—here, an action decades removed from the acts in question.

To the contrary, a rule that negates the five-year statute of limitations merely because a recovery is labeled "disgorgement" would undermine the very purpose of the statute of limitations.  As the Supreme Court explained in *Gabelli* in rejecting the SEC's effort to escape Section 2462's five-year clock by means of the so-called "discovery rule," the statute:

> sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities.  Statutes of limitations are intended to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  They provide security and stability to human affairs.  We have deemed them vital to the welfare of society, and concluded that even wrongdoers are entitled to assume that their sins may be forgotten.

*Id.* at 1221 (citations and quotation marks omitted). No reason exists to disregard this underlying policy only when the collection of a wrongfully gained amount is called a "disgorgement" instead of a "forfeiture."

### B. The Disgorgement Awards Here Amount To A "Penalty" Within The Meaning Of 28 U.S.C. § 2462

Even if the term "forfeiture" in Section 2462 were limited to punitive measures and thus made synonymous with "penalty," the disgorgement orders here should nonetheless be held time-barred because they lack any meaningful remedial purpose and are thus punitive. In securities law enforcement, it is settled that "disgorgement may not be used punitively," *SEC. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989), and thus the SEC must "establish[] a reasonable approximation of the profits causally related to the fraud," *Razmilovic*, 738 F.3d at 31. A disgorgement award that exceeds the amount attributable to the securities violation is not a remedy but rather an attempt to "fill the Federal Government's coffers," *Riordan*, 627 F.3d at 1234 n.1, and thus properly viewed as penal.

Here, the disgorgement orders are penal because they are not causally related to the disclosure and registration violations at issue. The tax-based order, for example, awards disgorgement of supposedly avoided taxes without regard for what the IRS might determine it is actually owed. In fact, the IRS was in the process of auditing the trusts and ultimately did bring a claim for taxes owed, after following the necessary procedures. ECF.476.at.46-48; ECF.627-1.at.16. Because

32

of the intricate nature of the Tax Code, which has various offsets, it was impossible for the district court to approximate the amount of taxes owed on the basis of the SEC's evidence, and not surprisingly, "the IRS has assessed an amount of actual tax liability that differs from the amount estimated" by the district court. ECF.627-1.at.16. Nor did the SEC demonstrate any causal link between accurate disclosures and tax liability. *See* ECF.476.at.48 ("The SEC has not shown that the Wylys' or Issuers' SEC filings *launched* the IRS audit of the Wylys and the offshore system, or even that accurate filings would have been likely to trigger an earlier examination."). *See infra* Part II.A.3.

The alternative disgorgement amount was similarly punitive, as the district court noted that "there is no evidence here that the defendants' unlawful conduct . . . resulted in any market distortion, price impact, or profit tied to the violation," ECF.436.at.16, that "[t]he jury did not find that the trading itself was unlawful and could not have reasonably done so," ECF.436.at.18, and that "the Wylys can point to facts that establish legitimate bases for some of their investment decisions," ECF.563.at.50. *See infra* Part II.B.1.

Absent the required causal connection, the disgorgement orders serve only as a "penalty" within the ambit of Section 2462.

*****

For all these reasons, the SEC's claims are time-barred as to all conduct prior to February 1, 2001, and the judgment should be vacated and remanded for reconsideration of any remedies that may still be permissible on the basis of conduct within the limitations period.

## II. THE DISGORGEMENT ORDERS ARE IMPROPER REMEDIES FOR THE SECURITIES VIOLATIONS HERE

Apart from the fact that the disgorgement awards for pre-February 1, 2001 conduct are time-barred, each of the two theories of disgorgement that the district court adopted is an abuse of discretion. The disgorgement award based on the amount of avoided taxes improperly usurps the exclusive authority of the IRS over assessment of taxes and awards hundreds of millions of dollars that bear no fair causal relationship to the discrete violations of registration and disclosure requirements at issue. The alternative trading-profits award suffers from the same absence of the required causal connection and improperly rests on unreliable testimony from a single SEC employee while disregarding a jury finding. Both awards should be vacated.

### A. The District Court's Tax-Based Disgorgement Award Is An Abuse Of Discretion

#### 1. Collection of Taxes Is Reserved Exclusively To The IRS

The Tax Code authorizes to the Secretary of the Treasury or the Secretary's delegate the exclusive authority "to make the inquiries, determinations, and

assessments of all taxes . . . imposed by this title." 26 U.S.C. § 6201(a). Accordingly, "[n]o civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced." 26 U.S.C. § 7401. The district court nonetheless permitted the SEC to recover a disgorgement award measured by the amount of taxes allegedly avoided by the nondisclosure of beneficial ownership, finding that, "as a formal matter, this is not a civil action for the collection or recovery of taxes." ECF.193.at.8; *see* ECF.476.at.58. That holding, approving an unprecedented tax-avoidance theory of disgorgement that the SEC has never before employed (6/5/13.Tr.20-21; ECF.193.at.8), requires this Court's reversal.

Longstanding authority reserves tax-assessment authority exclusively to the IRS. *See U.S. ex rel. Roberts v. W. Pac. R. Co.*, 190 F.2d 243, 247-48 (9th Cir. 1951) (requiring consent of the IRS commissioner for action for recovery of taxes due the United States); *Olson v. Mellon*, 4 F. Supp. 947, 950 (W.D. Pa. 1933) *aff'd sub nom.*, *U.S. ex rel. Knight v. Mellon*, 71 F.2d 1021 (3d Cir. 1934) (noting that the precursor to Section 7401 "disclose[d] a plain intent on the part of Congress to keep all cases for the collection of internal revenue taxes, fines, penalties, and forfeitures under the supervision of the Commissioner of Internal Revenue"); *United States v. Letscher*, 83 F. Supp. 2d 367, 379 (S.D.N.Y. 1999) (holding

35

authorization under Section 7401 "necessary to collect the outstanding federal tax assessments").

Despite this unequivocal bar, the district court held that "[t]here is no explicit prohibition, either in the Tax Code or in the Exchange Act, on using tax benefits as a measure of unjust enrichment in other contexts" and no "express limitation on the SEC's authority to calculate and disgorge any reasonable approximation of profits causally connected to the violation." ECF.476.at.57 (quotation marks omitted). In rejecting the argument that the disgorgement order would run afoul of Section 7401, the district court reasoned that a "tax is an enforced contribution to provide for the support of the government" whereas "[d]isgorgement is a discretionary and equitable remedy aimed at preventing unjust enrichment." ECF.476.at.58. In so reasoning, the court below ignored the reality that Congress and the courts have foreclosed the substantive determination of deficiencies in taxes supposedly owed without the authorization and participation of the IRS.

Multiple lines of authority converge to prohibit such unauthorized determination and recovery of supposed tax liabilities outside of IRS-initiated tax proceedings. For instance, in the False Claims Act context, private relators *and* the government are barred from recovering damages for unpaid taxes. Known as the "Tax Bar," this prohibition was specifically codified as a part of the False Claims

36

Act.  31 U.S.C. § 3729(d).   This statute "codif[ied] case law . . . which reserved discretion to prosecute tax violations to the IRS and barred FCA actions based on tax violations."  *U.S. ex rel. Lissack v. Sakura Global Capital Markets, Inc.*, 377 F.3d 145, 152-53 (2d Cir. 2004).  This Court accordingly held in *Lissack* that the Tax Bar precludes recovery by a private citizen where the claim pursued "is part of a scheme organized and governed entirely under the provisions of the Tax Code" and "is entirely dependent upon establishing a violation of the Tax Code."  *Id.* at 157.

Addressing this application of the Tax Bar, the district court concluded that "no analogue to the FCA Tax Bar exists in the securities context" and that "the purpose of the Tax Bar was 'to prevent *private* litigants from interfering with the IRS's efforts to enforce the tax laws.'"  ECF.193.at.10 (quoting *Lissack*, 377 F.3d at 156).  By contrast, the district court reasoned, "the SEC has a broad grant to pursue its central mission of making securities law violations unprofitable by seeking disgorgement."  ECF.193.at.10-11.

This explanation holds no weight.  As an initial matter, the district court was wrong to suggest that the Tax Bar applies only to private litigants.   The government may pursue a case under the False Claims Act and 31 U.S.C. § 3729(d) draws no distinction between the government and private litigants.  *See Lissack,* 377 F.3d at 152 (explaining that the False Claims Act allows recovery by

37

"the United States, or private citizens acting on its behalf" for violations). In addition, *Lissack* recognized that "the IRS has authority to recover the precise amounts Lissack is seeking in this action," 377 F.3d at 153, meaning that "the IRS can [] remedy all of the damage caused by this scheme," *id.* at 155. The same is true here, as evidenced by the IRS's current, separate pursuit of alleged tax deficiencies for itself in the bankruptcy proceeding. ECF.627-1.at.2-3.

Further, the Tax Bar merely codified case law predating and transcending the False Claims Act, confirming a broader rule that no federal agency other than the IRS may sustain an action for recovery of unpaid taxes. *See U.S. ex rel. U.S.-Namibia (Sw. Africa) Trade & Cultural Council, Inc. v. Africa Fund*, 588 F. Supp. 1350, 1351 (S.D.N.Y. 1984) (holding that the government could not sue under the False Claims Act to remedy a fund's improper tax-exempt status because "the government's recourse would be to revoke such status through administrative action and then to proceed to make a tax liability assessment and to issue a Notice of Deficiency for taxes due").

Cases outside the False Claims Act context reach the same conclusion. *See, e.g.*, *Wolkstein v. Port of N.Y. Auth.*, 178 F. Supp. 209, 213 (D.N.J. 1959) (dismissing case in which Port Authority bondholders sought a court order compelling the IRS commissioner to require the Port Authority to file tax returns because "[t]he civil action before us is essentially for the collection of taxes,"

38

which is "prohibited 'unless the Secretary or his delegate authorizes or . . . directs that the action be commenced'") (quoting 26 U.S.C. § 7401). As one New York district court explained, this reservation of rights exclusively to the IRS stems at least in part from the "intricacy of tax provisions" that fall within the core and unique competence of the IRS, as distinct from all other government agencies. *See U.S. ex rel. Mikes v. Straus*, 853 F. Supp. 115, 119 (S.D.N.Y. 1994).

Here, the tax-based disgorgement remedy was designed to calculate "the amount of taxes that would have been paid" upon "the total profits earned on the sale of the Issuer securities by the IOM trusts" if the Wylys had "disclosed beneficial ownership of the securities." ECF.476.at.56-57. In this respect, the tax-based disgorgement award "is part of a scheme organized and governed entirely under the provisions of the Tax Code" and "is entirely dependent upon establishing a violation of the Tax Code." *Lissack,* 377 F.3d at 157.

Indeed, the problems associated with usurping the IRS's authority through this SEC disgorgement action are especially apparent here. The bankruptcy court presiding over the IRS action for recovery of taxes from the Wyly family concluded that the grantor status issues decided in this case had preclusive effect. ECF.627-1.at.16 (granting the IRS's request "to preclude both Sam and [Caroline Wyly] from relitigating the underlying facts which led to the District Court's factual determination that the Offshore Trusts were grantor trusts for the purposes

39

of federal tax law along with that ultimate fact"). Thus, the IRS has been relieved of its burden to prove a difficult case that these were grantor trusts—because the district court here already did so in its securities-law remedies order. Although the district court initially recognized that another court could reach a different conclusion as to tax liability, ECF.627-1.at.33-38; ECF.476.at.62 n.205, the district court declined to clarify that the ruling should not have preclusive effect, *In re Samuel E. Wyly*, No. 14-35043-bjh11, ECF 798-2 (N.D. Tex. Bankr. Aug. 28, 2015) (filing of district court conference transcript). Similarly, although the district court at one point envisioned the potential for offset of the amount of disgorgement from taxes owed (thereby reinforcing the notion that the SEC action sought the collection of taxes), the procedure for obtaining such an offset remains uncertain and possibly illusory. ECF.590.at.7 (contemplating the IRS would use the amount paid to the SEC as an offset, even though the IRS is not a party, but acknowledging the IRS may refuse to do so).

In all of these ways, the district court's approach constitutes an improper end run around Section 7401 and is foreclosed by the Tax Code.

### 2. A "Reasonable Approximation" Of Taxes Requires Application Of The Relevant Tax Code Provisions

Furthermore, if the SEC could recover unpaid taxes through disgorgement based on any securities law violation that implicated the Tax Code, it would supplant the IRS's authority to administer the tax system under the detailed and

40

specific provisions and procedures that lie within the IRS's exclusive authority under Section 7401. The failure to follow these carefully crafted Tax Code requirements resulted in a disgorgement amount untethered to any proper calculation of taxes owed.

As noted, the reservation of taxation authority exclusively to the IRS stems at least in part from the "intricacy of tax provisions." *Mikes*, 853 F. Supp. at 119. The Internal Revenue Code prohibits the federal government from making, bringing, or prosecuting a proceeding in court for the collection of any unpaid federal income tax until certain procedural safeguards are met. 26 U.S.C. § 6213(a); *see also C.I.R. v. Shapiro*, 424 U.S. 614, 616-17 (1976) (holding that the United States "may not 'assess' a tax or collect it, by levying on or otherwise seizing a taxpayer's assets, until the taxpayer has had an opportunity to exhaust his administrative remedies, which include an opportunity to litigate his tax liability fully in the Tax Court"); *Pfeiffer Co. v. United States*, 518 F.2d 124, 129-30 (8th Cir. 1975) (assertion of deficiency "did not ripen into an enforceable claim for relief" until after assessment of tax, and "[b]y statute that assessment . . . could not be accomplished until 90 days after the notice of deficiency was issued."); *see also Crocker v. United States*, 323 F. Supp. 718, 723-24 (N.D. Miss. 1971) (no claim for unpaid taxes could be asserted because the IRS's deficiency procedures had not yet been followed).

41

Federal tax liability for a particular year ultimately depends upon consideration of *all* of the transactions in that taxable year. *See Finley v. United States*, 612 F.2d 166, 170 (5th Cir. 1980). Before the United States can maintain a proceeding to determine and recover unpaid income taxes, pursuant to 26 U.S.C. § 6213, the IRS first must determine that a tax deficiency exists—that is, that there is a difference between the amount of tax owed and the amount of tax paid. 26 U.S.C. § 6211. Thus, to evaluate tax liability in a given year (as opposed to for a given transaction), the IRS must consider net operating losses; ordinary and necessary business expenses related to the transactions; expenses for the production of income; short-term capital losses available in that particular tax year; long-term capital losses available in that particular tax year; charitable contribution deductions; certain tax credits and other deductions; and tax deferral allowances that suspend the taxable event to subsequent years. *See generally* 26 U.S.C. ch. 1, subch. B. Precisely because these inquiries are so complex, interrelated, and specialized, questions about federal income tax are reserved exclusively to the government's designated tax experts. *See* 26 U.S.C. § 7801(a).

Similarly, the tax-based disgorgement order below purported to determine as a substantive matter that the Wylys essentially had control over the trusts for purposes of Section 674 of the Tax Code, which provides that income earned by a trust may be attributable to a grantor if certain requirements are met.

42

ECF.476.at.66-67; *see* 26 U.S.C. § 674 (providing general rule and exceptions thereto); *see also* 26 U.S.C. § 671. The district court's "substance over form" rationale for that determination, however, contradicts longstanding precedent. *See Estate of Goodwyn v. C.I.R.*, T.C. Memo 1976-238, 1976 WL 3423 (1976) ("[T]he power of a grantor upon which he will be taxed is a power reserved by instrument or contract creating an ascertainable and legally enforceable right, not merely the persuasive control which he might exercise over an independent trustee who is receptive to his wishes."). If nothing else, any such ruling required the benefit of considered review and determination by the IRS.

Nor were requisite IRS procedures followed. Once the IRS has identified a deficiency, the IRS must provide a notice of the deficiency outlining the IRS's findings and proposed adjustments and afford 90 days to allow filing of a petition to the Tax Court for a redetermination. 26 U.S.C. § 6213. Absent a petition to the Tax Court to challenge the IRS's proposed assessments, the IRS may then assess and collect the additional taxes. 26 U.S.C. § 6213(c).

Despite the fact that the SEC has the burden "of establishing a reasonable approximation of the profits causally related to the fraud," *Razmilovic*, 738 F.3d at 31, none of those procedures was followed here. No tax deficiency was calculated under the appropriate rubric and no opportunity was afforded to challenge the calculation prior to the remedy proceeding. For instance, the Wylys reported and

43

paid more than $102 million (combined) in income taxes on annuity payments received from companies owned by the IOM Trusts from 2004 to 2013. DX-1087; DX-1088; ECF.445.¶5. The district court's disgorgement award, however, failed to deduct these tax amounts already paid as required by the Court's precedent. ECF.476.at.59; *see United States v. Helmsley*, 941 F.2d 71, 102 (2d Cir. 1991). The district court nonetheless purported to set disgorgement based on unpaid taxes. Because carefully crafted tax rules were not followed below, the district court arrived at an amount of taxes supposedly owed without ensuring that they "reasonably approximate" the taxes actually owed, and without affording the Wylys any of the procedural protections they would have in the tax system.

### 3. The Tax-Based Award Lacks Any Causal Link To The Securities Violations

The SEC had the burden "of establishing a reasonable approximation of the profits causally related to the fraud." *Razmilovic*, 738 F.3d at 31. "[T]o establish a proper disgorgement amount, 'the party seeking disgorgement must distinguish between the legally and illegally derived profits,' so that disgorgement is ordered only with respect to those that were illegally derived." *Id.* (citation omitted). In other words, "[i]t is the SEC's burden to establish both a reasonable approximation of profits and the causal connection between the approximation and the violations." ECF.436.at.14. If—and only if—the SEC meets this burden, then

"the burden shifts to the defendant to show that his gains were unaffected by his offenses." *Razmilovic*, 738 F.3d at 31 (citation omitted).

Under this standard, to establish entitlement to disgorgement calculated by an amount of supposed tax avoidance, the SEC was required to prove that the Wylys' failure to disclose their interest in the IOM Trusts specifically caused them to realize an unjust tax benefit. *See SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995). The district court erred in holding, ECF.476.at.70-71, that the tax-avoidance disgorgement amount satisfied that causal-connection requirement.

As both the district court and the bankruptcy court held, the tax issue turns not on the question of whether the Wylys had disclosed their beneficial ownership, but on whether the trusts at issue are grantor trusts. ECF.476.at.62-67; ECF.627-1.at.5 ("Sections 671 to 679 of Title 26 of the U.S. Code (the 'Tax Code') and associated regulations set forth rules by which property held in a trust, including a foreign trust, must be treated as property of the grantor for tax purposes."). The district court's analysis of tax liability, therefore, required examination of the Tax Code provisions and determination of whether the facts here fit any exemption to the rules for grantor trusts. That analysis was separate and independent from any discussion of securities violations or the Securities Act of 1933 or Securities Exchange Act of 1934.

45

The SEC was awarded disgorgement based on "the total profits earned on the sale of the Issuer securities by the IOM trusts" and "the amount of taxes that would have been paid on those profits had the Wylys accurately disclosed beneficial ownership of the securities." ECF.476.at.56-57. Yet the SEC offered nothing to tie the *disclosure* violations to the failure to pay taxes. Indeed, the district court articulated only two connections, both equally attenuated from the failure to pay taxes owed.

*First*, the district court reasoned that a proper SEC disclosure might have been useful evidence against the Wylys in a tax proceeding: "Even if admission of 'beneficial ownership' on a schedule 13D would not immediately reveal a fact that would establish control of an offshore trust, it would at least be facially inconsistent with a tax reporting position that did not include the profits from trades made by that offshore trust." ECF.476.at.70. In fact, there would have been no inconsistency under a proper understanding of the applicable tax statutes.

The SEC filings at issue would have revealed that the Wylys were "beneficial owners" of securities held offshore. In the securities context, beneficial ownership means shared or sole ability to make investment and voting decisions. *See* 17 C.F.R. § 240.13d-3. A disclosure that the Wylys had shared or sole investment or voting power would have no direct tax consequence because 26 U.S.C. § 675(4)—which the district court failed to cite in its disgorgement

46

opinion—permits the grantor of a trust to participate in voting and investment decisions, so long as the trustee's final approval or consent is required. An SEC "beneficial ownership" disclosure thus by itself reveals nothing about tax liability.

In light of this significant problem, the district court's causation analysis instead relied on a different Tax Code provision, 26 U.S.C. § 674. That provision deals not with investment or voting power—which is the only kind of retained power that any SEC disclosure might have revealed—but with the tax consequences of retained *authority to distribute trust corpus or income to beneficiaries*. *See* 26 U.S.C. § 674(a) ("The grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income therefrom is subject to a *power of disposition*, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party [i.e., a trustee].") (emphasis added). Thus, even if the Wylys shared investment and/or voting power with the IOM trustees, that fact is irrelevant to determining whether the IOM trustees also had the power "to distribute, apportion, or accumulate income" or "pay out corpus" to or for a beneficiary without the approval or consent of any other person. *See* 26 U.S.C. § 674(c). The district court failed to explain how a disclosure of investment power to the SEC—a power that grantors can lawfully share with trustees without adverse tax consequences—could have alerted tax authorities to a Section 674(c) problem.

47

*Second*, the district court reasoned that "none of the four Issuers reported income to the Wylys in connection with the options granted as compensation and transferred to the trusts." ECF.476.at.71. In reaching this finding, the district court relies on two transactions—one in 1992 and one in 2001—for which the Issuer did not report taxable income to the Wylys because of "their misrepresentations about disclaiming beneficial ownership over the options." ECF.476.at.71. This link to two transactions, further dependent on the actions of a third party, are also insufficient to establish the requisite causal link.

In addition, the SEC's simplistic analysis failed to offer any proof that the Wylys have any unpaid tax liabilities at all. As of 2014, the IRS had not yet attempted to assess the federal income taxes that the SEC claimed that the Wylys owe. ECF.627-1.at.2. In fact, the district court concluded that "[t]he SEC ha[d] not shown that the Wylys' or Issuers' SEC filings *launched* the IRS audit of the Wylys and the offshore system, or even that accurate filings would have been likely to trigger an earlier examination." ECF.476.at.48. The record thus fails to establish that the Wylys realized an unjust tax benefit by securities nondisclosures.

Accordingly, the disgorgement lacked the requisite causal connection to the securities violations found below.[7]

---

[7] This is another reason why the tax-avoidance disgorgement order constitutes a penalty subject to Section 2462's statute of limitations. *See* Part I.B, *supra*.

**B.     The District Court's Conditional Trading-Profits Disgorgement Award Is An Abuse Of Discretion**

**1.     The Trading-Profits Award Lacks Any Causal Link To The Securities Violations**

The district court likewise erred in holding, ECF.563.at.33, that its alternative conditional trading-profits disgorgement calculation was causally connected to the Wylys' securities violations. Even according to the district court's account, the record establishes at most that *some* of the Wylys' trades benefited from undisclosed information, which cannot be taken as basis to award disgorgement of profits from *all* of their trades. Here, the district court improperly shifted the burden to the Wylys to establish the lawfulness of their profits.

Notably, the district court at the outset had been careful to avoid this very error. When the SEC first sought to disgorge all of the Wylys' trading profits, the district court rejected that approach, recognizing the absence of any evidence that the Wylys had earned *any* profit specifically from their securities violations. ECF.436.at.16. In so ruling, the district court noted that "there is no evidence here that the defendants' unlawful conduct—that is, the scheme to hide beneficial ownership by failing to disclose transactions—resulted in any market distortion, price impact, or profit tied to the violation. Nor is there evidence that the scheme was motivated by the expectation of such profits." ECF.436.at.16-17. The district court correctly concluded that, "[a]s a matter of law, the SEC cannot show that all

49

of the profits on all of the sales by the IOM trusts throughout this extensive time period are reasonably connected to the Wylys' continuous failure to disclose beneficial ownership." ECF.436.at.20. As a result, the disgorgement request "smack[ed] of punishment, not equity or deterrence." ECF.436.at.20. Nevertheless, the district court gave the SEC "one final opportunity to propose a reasonable approximation [of trading profits] causally connected to the violations." ECF.436.at.22. It indicated that the SEC, instead of seeking all profits from all trades, should focus on profits earned from "specific trades" based on undisclosed information. ECF.436.at.22. While that is correct, what followed is error.

Eventually the SEC submitted the expert report of Dr. Chyhe Becker, an SEC employee. 11/12/14.Tr.96. Based on Dr. Becker's testimony, the district court concluded that the Wylys' securities violations—namely, the failure to disclose their beneficial ownership of the trusts—gave the Wylys (1) a secrecy advantage (they could trade without disclosure), which in turn created both (2) a liquidity advantage (the secrecy permitted them to convert relatively illiquid securities into cash) and (3) an informational advantage (trading more and in secret enabled them to use their inside information to a greater extent). ECF.563.at.27. Dr. Becker did not, even purportedly, link the three advantages to any specific transaction or provide a reasonable approximation of how many of the Wylys' transactions were linked to those advantages.

The Wylys' informational advantage was itself lawful and resulted in no market distortion or price impact, as even the district court recognized. ECF.436.at.16.  The Wylys submitted undisputed evidence that most of the trades were performed for independent reasons that had nothing to do with any secrecy, liquidity, or informational advantage.  ECF.563.at.30.  But Dr. Becker did not bother to examine any other reasons for the transactions or estimate the percentage of transactions that might have been caused by informational advantage. 11/17/14.Tr.198.  Even so, the district court found the SEC's evidence sufficient simply because the SEC had "established a causal connection between *some* amount of trading profits and the disclosure violations."  ECF.563.at.33 (emphasis in original).

This error warrants reversal of the alternative award.  It is the *SEC's* burden—not the Wylys' burden—to "distinguish between the legally and illegally derived profits, so that disgorgement is ordered only with respect to those that were illegally derived."  *Razmilovic*, 738 F.3d at 31 (citation and quotation marks omitted).  The SEC failed to link the specific trades to any of the alleged advantages.  Thus, as a matter of law the SEC failed to establish a causal connection between the securities violations and the entire amounts ordered disgorged.

Because the SEC failed to carry its burden on causation, the judgment ordering disgorgement based on this alternative theory should be reversed. At a minimum, the district court should be instructed on remand to limit the alternative disgorgement amount to any specific trades that may be shown to be tainted by insider information and aided by the disclosure violations.

### 2.    The SEC's Expert Employed An Unreliable Methodology

The district court further abused its discretion by accepting the SEC expert's calculations for the amount of the alternative disgorgement award. The SEC's expert, Dr. Becker, posited a hypothetical "buy-and-hold investor" who bought the same securities and held them for the same average period as the Wylys, ECF.563.at.19-21, and treated the difference between that hypothetical investor's earnings and the Wylys' actual earnings as a measure of the Wylys' "ill-gotten gains" from informational and secrecy advantages, ECF.563.at.19-21. But as the Wylys' expert explained during the second remedies bench trial (11/17/14.Tr.243-59; PX-9242), actually buying and holding the relevant securities would have produced *larger* gains than the Wylys realized (11/17/14.Tr.253). Crediting Dr. Becker's testimony thus violated the court's obligation to "separate helpful conclusions from ones that are not grounded in reliable methodology," *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09–cv–7199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) (internal quote marks omitted), and

52

constituted an abuse of discretion, *see SEC v. Jones*, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (declining to order disgorgement when SEC was "unable to set forth any evidence of specific profits subject to disgorgement").[8]

### 3. The Trading-Profits Award Contradicts The Jury Finding On Beneficial Ownership

As a general matter, a court may not reconsider facts found by the jury. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 358-59 (1962). This principle stems from the Seventh Amendment, which provides in part that "no fact tried by jury, shall be otherwise reexamined in any Court of the United States." U.S. Const. amend. VII; *see also Blyden v. Mancusi*, 186 F.3d 252, 268–69 (2d Cir. 1999) (holding that, when a case is bifurcated into a liability phase and a remedy phase, the Seventh Amendment prohibits the factfinder at the remedy phase from reexamining facts found by a jury at the liability phase).

---

[8]  Dr. Becker's methodology was further flawed because, for example, it initially treated options (for the Wylys) and stock (for the hypothetical buy-and-hold investor) as having the same rate of return (11/12/14.Tr.232), even though the option-holder retains the value of the difference between the stock price and exercise price until the option is exercised, leading to a higher rate of return (11/17/14.Tr.279-80) for the option-holder than for the hypothetical "buy and hold" investor whose capital is tied up in the investment from the beginning (11/17/14.Tr.286). When Dr. Becker revised her calculation to correct for that error (11/17/14.Tr.232-33), the proposed disgorgement amount dropped by nearly $100 million (to $95.2 million) (11/12/14.Tr.88). That the district court still credited the higher number (ECF.563.at.41), is again an abuse of discretion.

On the special verdict form, the jury specifically found that the Wylys retained beneficial ownership of the securities when they were transferred offshore to the IOM Trusts. ECF.473.at.9-10; ECF.476.at.24. By contrast, the trading-profits disgorgement order is predicated on the assumption that the Wylys obtained a *new* interest in the relevant options when the options were transferred offshore. ECF.563.at.42-43 & n.123. That is because Dr. Becker's method purports to compare the Wylys' rate of return to a hypothetical "buy and hold" investor, and thus assumes that the Wylys "bought" the assets on the date of the transfer. ECF.563.at.19-21. Using this assumption, the district court ruled that the transfer date was the appropriate start date because it marked the beginning of the "secrecy advantage." ECF.563.at.42.

That assumption is directly contrary to the jury's finding and thus violates the Seventh Amendment. *See, e.g.*, *Blyden*, 186 F.3d at 268-69 (holding that a bifurcated procedure violated defendant's Seventh Amendment rights when jury finding at the liability stage of fact in special verdict form that served as basis for damages was reexamined at the damages stage).

*****

For all these reasons, the Court should vacate the alternative conditional disgorgement award and remand for recalculation of any alternative measure of disgorgement.

## III. THE AWARD OF PREJUDGMENT INTEREST FOR A PERIOD OF 22 YEARS IS AN ABUSE OF DISCRETION

In addition to the amount of disgorgement ordered, the district court awarded over $100 million in prejudgment interest covering more than 22 years. Such an award cannot be squared with the court's obligation to "consider '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court,'" *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (quoting *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–34 (2d Cir. 1992)), including "the degree of personal wrongdoing on the part of the defendant," and "whether the plaintiff delayed in bringing or prosecuting the action," *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 176 (1989).

The district court's award of prejudgment interest is not supported by those considerations. The district court took no account of the SEC's two-decade delay in bringing suit or the Wylys' cooperation in entering a tolling agreement. The upshot was to reward the SEC for its delay while punishing the Wylys for their patience, imposing prejudgment interest that now runs throughout the tolling agreement (as well as for many years prior) and totals more than $100 million. ECF.591.at.2-3. Analysis of the relevant factors shows that the district court abused its discretion by this prejudgment interest award.

55

*First*, the Wylys' offenses all pertain to the non-filing of SEC disclosures or the sale of unregistered securities. The district court dismissed with prejudice the only insider trading claim in the case, finding the SEC lacked evidence to support the claim. ECF.405.at.27. Further, the SEC has not alleged that these offenses had victims apart from the IRS, which remains perfectly equipped and positioned to vindicate its own interest in the tax proceeding.

*Second*, the Wylys' personal culpability is limited, given the nature of the securities offenses and their cooperation with the investigation. The Wylys consistently followed the advice of their legal counsel, and neither refused to file nor directed others to refrain from filing SEC disclosures that their counsel indicated should be filed. The Wylys turned over a bevy of otherwise privileged communications to the SEC. These facts mitigate the degree of any personal wrongdoing and deserve to be properly weighed before prejudgment interest is awarded. *See Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir. 1969) (remanding to district court to make specific findings on the personal wrongdoing of defendants in connection with award of prejudgment interest).

*Third*, the existence of a good-faith dispute over the amount of unpaid taxes owed should preclude the award of prejudgment interest. Such an award of prejudgment interest is especially inappropriate in this case where the IRS, the agency tasked with assessing any tax deficiency, had not yet made any such

56

assessment, and a good-faith dispute exists over the appropriate tax treatment. *See Wickham Contracting Co.*, 955 F.2d at 834 (prejudgment interest inappropriate when there is a good faith dispute between the parties as to the existence of amounts owing). The district court's award of prejudgment interest for the amount of unpaid taxes supposedly owed only compounds the intrusion upon the exclusive sphere of the IRS, which is the sole agency tasked with collecting taxes under Section 7401 and the sole agency responsible in the first instance for determining any unpaid interest owed with respect to any tax deficiency. *See* 26 U.S.C. § 6601.

*Fourth*, as the district court acknowledged, "the SEC is in part responsible for the delay." ECF.563.at.54. It follows that, even setting aside any statute-of-limitations bar, *see supra* Part I, the time period for which prejudgment interest was calculated at the very least should be discounted lest the SEC be rewarded and the Wylys penalized for the SEC's delay. In *SEC v. First Jersey*, this Court held that the SEC's delay in bringing litigation did not warrant a reduction in the award of prejudgment interest where the "defendant . . . *had use of the unlawful profits for the entire period*." *First Jersey*, 101 F.3d at 1477 (emphasis added); *accord SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998). Here, by contrast, the SEC's claims pertain to securities and funds held in IOM Trusts to which the Wylys did not have title and as to the majority of which the Wylys were non-beneficiaries.

*Fifth*, the parties to this litigation entered into a tolling agreement with the Wylys effective February 1, 2006, that permitted the SEC to continue its investigation until the filing of its complaint in July 2010. That tolling period should not be included in any calculation of prejudgment interest. *See SEC v. Monarch Funding Corp.*, No. 85 Civ. 7072 (LBS), 1996 WL 562983, at *2 (S.D.N.Y. Oct. 3, 1996) (denying prejudgment interest for period during which the case was suspended); *see also SEC v. Dibella*, No. 04-cv-1342 (EBB), 2008 WL 6965807, at *5 (D. Conn. Mar. 13, 2008) *aff'd*, 587 F.3d 553 (2d Cir. 2009) (distinguishing reduction in prejudgment interest award where both parties had agreed to suspend the litigation for seven of twelve years).

*Finally*, the 22-year period that the prejudgment-interest award spans is inequitably long. ECF.563.at.58 (stating that the district court "continue[d] to be troubled by the extended time period at issue here—as long as twenty-two years"). While this Court has upheld prejudgment interest awards for time periods exceeding ten years, an order imposing prejudgment interest spanning more than two decades is extraordinary, as is the amount of more than $100 million in relation to a $187 million disgorgement award. ECF.591.at.2-3.

Accordingly, this Court should vacate the award of prejudgment interest and remand with instructions as to how the applicable factors should be properly applied.

## IV. THE DISTRICT COURT ERRED IN DECIDING KEY SECTION 5 ISSUES AS A MATTER OF LAW

In addition to the tax-based and alternative trading-profits disgorgement calculations for the disclosure violations, the district court awarded $16.8 million in total disgorgement on the SEC's Section 5 claims. But the district court erred in removing from the jury's consideration the question of whether the transactions underlying the Section 5 claims qualified as "distributions" and deciding for itself that the failure to disclose a relationship between the Wylys and the trusts rendered the Section 5 exemption altogether inapplicable. And because disputed issues of fact existed, the district court should have allowed the jury to determine whether the Section 5 exemption applies.

### A. The District Court Erred In Granting Judgment That The Transactions Qualified As Distributions

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, prohibits the sale of a security in interstate commerce unless a registration statement is in effect or an exemption applies. The jury found that the Wylys violated Section 5 through the trusts' sale of unregistered shares of Michaels Stores stock purchased in 1996 and sold over the next four years. ECF.476.at.25. Under Section 4(1) of the Securities Act, however, Section 5 "shall not apply" to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). In light of the Section 4(1) exemption, the SEC had to prove that transactions were conducted by "an

issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). Section 2(11) of the Securities Act defines an "underwriter" as a person who "offers or sells for an issuer in connection with . . . the distribution of any security." 15 U.S.C. § 77b(a)(11). For purposes of the underwriter definition, "the term 'issuer' . . . include[s], in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." 15 U.S.C. § 77b(a)(11).

On the SEC's motion for judgment as a matter of law, the district court held that the "high volume" sale constituted a "public offering" that required that "the offeree ha[ve] access to financial information about the investment similar to what would be found in a registration statement." 5/6/14.Tr.2991. Thus, the district court concluded, "[w]hile significant information was available about Michaels Stores' stock, this information was not similar to what would be in a registration statement," which would have "included the identity of the sellers and their relationship to the issuing company and control persons." 5/6/14.Tr.2991. On this basis, the district court declined to have the jury decide the question whether the transactions here qualified as "distributions" under Section 5 to the extent that the Wylys controlled the trusts. But the district court's ruling failed to account for the other relevant factors.

The statute does not define "distribution." *Geiger v. SEC*, 363 F.3d 481, 484 (D.C. Cir. 2004). Instead, to determine whether a transaction qualifies as a distribution, a factfinder must consider a variety of factors. *Gilligan, Will & Co v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959). As a general rule, "the governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Id.* Other relevant considerations include "the size of the offering, the number and relationship of the offerees, and the manner in which the offering is made," *SEC v. Univ. Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976), and "the offerees' access to relevant information and the purchaser's intent at the time of purchase," *Neuwirth Inv. Fund, Ltd. v. Swanton*, 422 F. Supp. 1187, 1197 (S.D.N.Y. 1975). A court must consider these factors consistent with the purpose of the registration requirement, which is to "protect[] investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

Here, the district court considered only the volume of the sale and the lack of information as to "identity of the sellers and their relationship to the issuing company and control persons." 5/6/2014.Tr.2991. But anyone purchasing these unregistered shares would have had access to all of the existing registration

61

statements, and all other SEC filings, which Michaels Stores had been making with the SEC. Thus, in this case, anyone buying these shares would have had "such information as a registration would have disclosed, or have access to such information." *Gilligan*, 267 F.2d at 466.

The SEC itself, in implementing the Section 4(1) exemption through the so-called "safe harbor" of Rule 144, identified three factors to be considered in determining whether a sale of unregistered securities qualifies as a "distribution." *See Definition of Terms "Underwriter" and "Brokers' Transactions,"* Release No. 33-5223, 1972 WL 125477, at *15 (Jan. 10, 1972). Here, a jury could have determined that these factors show that no "distribution" occurred. *First*, as the district court itself noted, the public had ample information about Michaels Stores. 5/6/14.Tr.2991. *Second*, the trusts had held onto the shares for a sufficiently long period of time to indicate that they were purchased with an investment intent, rather than an intent to distribute to the public. ECF.298.at.1-2. *Third*, the amount of stock the trusts resold was well within normal volumes of trading such that it had no discernable impact on the market. DX-1046 (empirical analysis showing that the resales in 1997 were so low they were within limits set by Rule 144). The small volume of sales indicates the trades were more akin to routine transactions by individuals than distributions by an issuer.

62

Disregarding these authorities, the district court fashioned its own legal test for what constitutes a "distribution," withholding the question from the jury on the ground that any hypothetical registration statement "would have also included the identity of the sellers and their relationship to the issuing company and control persons." 5/6/14.Tr.2991. In fashioning this test, the district court ignored the applicable legal test—both as articulated by this Court in *Gilligan*, and as elaborated in the SEC's own rulemaking in Rule 144. Because the district court failed to apply the correct legal test, it erred in ruling that the transactions necessarily qualified as distributions.

### B. Judgment As A Matter of Law Was Improper Because Disputed Issues Of Fact Remained

Even if the district court's reformulation of the applicable test were correct (it is not), application of that test required a factual assessment that should have been made by the jury, not by the district court. A court may grant judgment as a matter of law "only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993). If the question is whether public information about "[t]he identity of the sellers and their relationship to the issuing company and control persons" mattered to buyers, 5/6/14.Tr.2991, the facts before the jury showed, at the very least, disputed issues of fact on the question of

63

whether the public was aware that the trusts had purchased and were selling the unregistered shares of Michaels Stores.

For example, the public record contained information about Michaels Stores and about the trusts' purchase of Michaels Stores stock. 4/29/14.Tr.2242-45. The public knew the trusts had purchased these shares—the names of the trusts were included in purchase agreements that Michaels Stores filed with the SEC soon after the private placements. ECF.298.at.2. The public record even contained information that the trusts were affiliated with the Wylys, who were publicly known to be in control of Michaels Stores. Michaels Stores' press releases about the sales noted that the Wylys were "beneficiaries" of the trusts. ECF.476.at.48-49. And immediately after the sales in 1997, the trusts filed public Forms 144 with the SEC, as required by Rule 144, that disclosed that the IOM Trusts were selling. PX-7012.

Thus, even under the district court's test, the jury could have concluded that no "distribution" occurred because the "identity of the sellers" was already known to the public and thus that the exemption applied, making it error to grant judgment as a matter of law.

## V. THE DISTRICT COURT ERRED IN ALLOWING THE SUBSTITUTION OF THE CHARLES WYLY ESTATE FOLLOWING HIS DEATH

Finally, to the extent the disgorgement awarded here is punitive and non-compensatory, the district court erred in permitting substitution of the Estate of Charles Wyly for Charles Wyly. Rule 25(a)(1) of the Federal Rules of Civil Procedure provides that, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). The issue of whether disgorgement, an equitable remedy, abates upon the death of a defendant is governed by federal common law. *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993). Federal common law provides that governmental actions for non-compensatory recoveries abate upon the death of the defendant. *See United States v. Price*, 290 F.2d 525, 526 (6th Cir. 1961) ("If, on the other hand, no direct injury has been done to the United States, the action is not for compensation but for the recovery of a penalty, and abates upon the death of the defendant."); *see Survival of Actions Brought Under Federal Statutes*, 63 Colum. L. Rev. 290, 301 (1963) ("Whenever recovery of other than compensatory damages is sought by a public officer, it has been consistently held that the action is penal.").

Here, the district court determined that a request for non-compensatory disgorgement survives the death of the defendants because civil forfeiture

65

proceedings do not abate upon death. ECF.89.at.13. Both "require forfeiture of property used in illicit activities." ECF.89.at.14. But in this case, unlike cases where disgorgement is sought by the SEC to compensate the victims of securities violations, *SEC v. Fischbach Corp.*, 133 F.3d 170, 174-76 (2d Cir. 1997) (noting SEC's policy "'wherever possible [] to recommend a distribution plan by which a defendant's unlawful gains are paid out to defrauded investors."), the Wylys have neither defrauded investors nor committed violations as to identified victims. Indeed, the SEC has conceded that its disgorgement request is not meant to compensate victims. 1/23/12.Tr.27. For those reasons and those set forth *supra* in Part I.B, this case should be treated as non-remedial for purposes of surviving Charles' death.

## CONCLUSION

The judgment should be reversed, and both disgorgement awards vacated and remanded.

Dated: December 4, 2015      Respectfully submitted,

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP


By: /s/ Kathleen M. Sullivan
    Kathleen M. Sullivan
    Ellyde R. Thompson
    51 Madison Avenue, 22nd Floor
    New York, New York 10010
    (212) 849-7000

    Derek L. Shaffer
    QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
    777 6th Street NW, 11th Floor
    Washington, DC 20001
    (202) 538-8000

    Mark H. Hatch-Miller
    SUSMAN GODFREY, LLP
    560 Lexington Avenue, 15th Floor
    New York, New York 10022-6828
    (212) 336-8330

    *Attorneys for Appellants*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) and this Court's order dated December 2, 2015 because it contains 15,278 words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FRAP 32(a)(6) and the type style requirements of FRAP 32(a)(7) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

/s/ Kathleen M. Sullivan
Kathleen M. Sullivan
*Attorney for Appellants*

Dated: December 4, 2015